IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | |
| THOMAS RIPPY | : | NO. 10-95-14 |

**MEMORANDUM**

Baylson, J.                                                                                                   July 27, 2011

**I.     Introduction**

Following trial in this prosecution for aiding and abetting mail fraud, the parties briefed whether the government had met the Third Circuit's standard for guilt under the authority of United States v. Pearlstein, 576 F.2d 531 (3d Cir. 1978), and United States v. Dobson, 419 F.3d 231 (3d Cir. 2005). Trial Tr., 79-80, Jan. 31, 2011, ECF No. 292. The government filed a Memorandum of Law on March 29, 2011, and contended that it had met its burden. Mem. of Law, ECF No. 311. Defendant Thomas Rippy ("Defendant") responded with a Memorandum in Support of Acquittal on May 9, 2011, asserting that the government's evidence failed to demonstrate Defendant's culpable participation in the alleged mail fraud and that the matter is barred by the statute of limitations. Def. Mem. in Supp. of Acquittal, ECF 365.

Following review of these briefs, the Court entered an Order on June 23, 2011 finding Defendant guilty. This Memorandum will explain the reasons. The Court has concluded that Defendant's statute of limitations argument is without merit, and the government has proven beyond a reasonable doubt that Defendant aided or abetted a scheme to commit mail fraud.

-1-

## II. Factual and Procedural Background

### A. Indictment

On February 18, 2010, a federal grand jury returned a forty-count Indictment charging seventeen individuals with various counts of mail fraud and aiding and abetting mail fraud, arising out of a scheme to receive payments for insurance claims involving phony accidents and bogus medical treatments. See generally Indictment, ECF No. 1. Defendant was only charged with one count, Count Twelve, which alleged that Defendant aided and abetted the filing of fraudulent insurance claims by Co-Defendant Wallace Morris, Sr. ("Morris") in violation of 18 U.S.C. § 1341 and § 2. Id. at 13-16. These fraudulent insurance claims falsely represented that an automobile accident had occurred, in order for Defendant, Morris, and five other individuals to obtain free chiropractic treatment and to recover personal injury settlements from Safe Auto Insurance Company in the absence of injuries. Id. at 13-14, 16.

As to Defendant, the Indictment stated that "[b]etween on or about February 12, 2004 and on or about May 17, 2005, defendant THOMAS RIPPY recruited James Brown to be a participant in this fictitious accident." Id. at 14. The Indictment further alleges that Morris provided a "fictitious story" for Brown and Aiesha Roane to tell concerning the accident. Id. at 15. Consequently, Defendant's actions as part of this larger scheme caused Safe Auto Insurance Company to mail a $7,000 check to Morris on or about May 17, 2005. Id. at 15-16.

The Court conducted a non-jury trial on January 31, 2011. Following stipulations agreed to by the parties, the government called only one witness, James Brown. Defendant was the only defense witness. At the conclusion of trial, the Court stated that it found Brown's testimony "credible." Id. at 79. The Court gave leave to the parties to file briefs regarding whether the

government had satisfied the Third Circuit's standard to convict Defendant of mail fraud. Id. at 79-81.

### B. Stipulations

Prior to trial, Defendant and the government stipulated to a number of facts pertaining to the alleged mail fraud. Id. at 16. The parties agreed that former Philadelphia Police Officer Drexel Reid falsified his report ("Form 75-48") about an automobile accident between two vehicles at the intersection of Interstate 76 and Route 1 on February 12, 2004. Id. at 16-17. The Form 75-48 fictitiously stated that James Brown and Wallace Morris, Sr. drove the two vehicles and that Brown's wife, Rochelle, and Aiesha Roane were passengers of the two vehicles. Id. at 17.

The parties also stipulated that Rochelle Brown and Roane would have testified that this alleged accident never occurred. Id. at 18. Roane was connected to the alleged incident due to her prior involvement with Morris, and Brown provided his wife's personal information to someone who wrote the fictitious Form 75-48. Id. at 18-19. Further, it was stipulated that a representative from Safe Auto Insurance Company would have identified the $7,000 check that the company issued to Morris, as a result of the fictitious 2004 accident. Id. at 20.

During trial testimony, the parties stipulated that Grand Jury Exhibit 17 depicted Morris and that Grand Jury Exhibit 18 depicted Jerry Blassengale, a.k.a. "B.J." Trial Tr., 49.

### C. Brown's Testimony

Brown testified that Defendant was a "mutual acquaintance" and that, prior to the mail fraud, Defendant "came up to [him] . . . and asked [him if he wanted] to make a couple of dollars." Id. at 22-23. Brown characterized Defendant's statements as "[not] explicit, but

[Defendant] said it was involving insurance" and asked Brown if he had "insurance on [his] car." Id. Brown testified that he told Defendant that he did have automobile insurance; Brown testified that Defendant stated in response, "[Defendant] was going to hook me [Brown] up with some people, and then I [Brown] had to give [Defendant] my insurance card." Id. at 23-24. Further, Brown stated that Defendant said, "I [Brown] was supposed to get some money . . . for giving my insurance card up, and my information." Id. at 24.

The prosecutor then asked Brown, "Did Mr. Rippy indicate to you what he was going to do with that insurance card?" In response, Brown stated, "[Defendant] said something about an insurance scam." The prosecutor repeated, "Insurance scam?" Brown responded, "Yeah, insurance situation, yeah." Brown testified that he gave his Safe Auto insurance card to Defendant at that meeting. Id. at 24.

Brown stated the next time he and Defendant met, Defendant "hooked [him] up with" and introduced him to Morris.[1] Id. at 24-25. Brown testified that Defendant's last action was to bring Brown to Morris's home where Defendant told Brown "this [was] the guy that I was supposed to be hooked up with to do this insurance thing." Id. at 29-30. Brown stated that Defendant left before the scheme was explained in detail by Morris. Id. at 28. Brown testified that after Defendant arranged the meeting between Brown and Morris, Defendant had no further conversations with him that referred to the insurance "situation." Id. at 46-47.

Regarding Brown's meeting with Morris, Brown testified that Morris told him "police officers [would fill] out accident reports . . . and we would have an insurance accident report" although no accident would or did occur. Id. at 26. Brown stated that Morris informed him that

---

[1] During trial, the prosecutor never established how much time elapsed between these two meetings. See generally Trial Tr., 25.

"I [Brown] could have received some financial gratitude for the situation." Id. The prosecutor never questioned Brown about, and Brown never testified, whether his Safe Auto insurance card was returned to him or by whom. See generally Trial Tr., 20-30.

However, in a subsequent meeting with only Morris and "the doctor" or "the doctors," Brown and his wife "reneged from the situation" when his wife expressed that their involvement "[was not] the right thing to do."[2] Id. at 32-33. Nonetheless, Brown testified that Morris gave him $200 for his cooperation at this meeting. Id. at 33.

Brown further testified that he was told that he would not be prosecuted federally by pleading guilty in Pennsylvania state court to insurance fraud charges related to this case; in state court, Brown received probation as a result of Accelerated Rehabilitative Disposition (ARD). Id. at 47.

    **D.**    **Defendant Rippy's Testimony**

In contrast to Brown's testimony, Defendant testified that he was an "acquaintance" of Brown and that on one occasion he noticed that Brown "had a dent up front [on his Ford Contour]." Id. at 51-52. Defendant testified, "I think I told him that my nephew [Jerry Blassengale] could fix his car. I introduced [Brown and Blassengale] and that was it." Id. at 53. Defendant further testified that "Brown gave [Blassengale] his insurance card. . . . James Brown never gave me anything." Id. at 56.

Defendant testified that he arranged a meeting between Brown and Blassengale, not Morris. Id. Defendant's testimony reflects that he remained for the meeting and that

---

[2] The prosecutor never established when this subsequent meeting took place or the exact identity or identities of the person or persons that Brown described only as "the doctor" or "the doctors." Trial Tr., 32-33

"[Blassengale] explained to . . . James Brown that he would eat up [Brown's] $500 [insurance] deductible." Id.  Defendant testified that Brown later stated that he and his wife "[were not] going through with it," and Defendant sought no additional detail as to what Brown was referring.  Id. at 53.  Defendant stated that he never received any compensation from Blassengale, Morris, "or anybody else." Id. at 55.  Defendant testified that he had no further knowledge of the mail fraud.  Id. at 56.  The Court finds that Defendant did not testify truthfully as to his full knowledge and involvement in the scheme.

### III. The Parties' Contentions

#### A. The Government's Contentions

The government filed a Memorandum of Law asserting that the trial testimony regarding Defendant's conduct sufficiently meets the Third Circuit's standard to convict for mail fraud under Pearlstein, 576 F.2d at 534, Dobson, 419 F.3d at 237, and United States v. Kemp, 500 F.3d 257, 299-300 (3d Cir. 2007).  Mem. of Law 4-6.  The government contends that this case is distinct from and not as complex as Dobson, and that the government's case at trial proved all of the elements of aiding and abetting mail fraud beyond a reasonable doubt.  Id. at 6-8.

#### B. Defendant's Contentions

Defendant filed a Memorandum in Support of Acquittal contending that the government did not prove at trial that Defendant aided or abetted mail fraud.  Def. Mem. in Supp. of Acquittal 1.  Defendant contends that Brown's and Defendant's testimonies were not in conflict and that the only fact Defendant and Brown disagreed on was whether Defendant "asked to see Mr. Brown's insurance information." Id. at 3.

Defendant further contends that even if the evidence offered at trial suggests his

involvement in the alleged mail fraud, the evidence proffered at trial was too vague to demonstrate the requisite knowledge required to support a verdict of guilt.  Id. at 2, 4. Lastly—and without supporting authority—Defendant argues this matter is prohibited by a five-year statute of limitations and should be dismissed.  Id. at 4.

VI. **Legal Standards**

    A. **Jurisdiction**

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 3231, as the government has asserted in Count Twelve that Defendant aided and abetted mail fraud, in violation of 18 U.S.C. § 1341 and § 2.

    B. **Standard of Review**

Pursuant to Fed. R. Crim. P. 23, a defendant may waive his right to a jury trial. Following a bench trial, "the court must find the defendant guilty or not guilty.  If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion."  Fed. R. Crim. P. 23©.

The Third Circuit has held that a trial court cannot avoid making findings of fact conditioned on the defendant's waiver of such findings after requesting a non-jury trial.  United States v. Livingston, 459 F.2d 797, 789 (3d Cir. 1972) (en banc). "Detailed legal conclusions are . . . appropriate in non-jury criminal proceedings, particularly when the facts of a case suggest several legal principles which the trial judge might have invoked."  Id., 459 F.2d at 798.  This Memorandum will constitute the Court's findings of fact and conclusions of law.

V.   **Discussion**

   A.   **Statute of Limitations**

Count Twelve is not time barred by a statute of limitations. Unless expressly provided by law, the statute of limitations for non-capital federal offenses is five years after the offense has been committed. 18 U.S.C. § 3282 (2006). "The statute of limitations in a mail fraud case runs from the date of the charged mailing, notwithstanding that the defendant's actions concerning the scheme to defraud occurred before the statutory period." United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992); accord United States v. Read, 658 F.2d 1225, 1240 (7th Cir. 1981); United States v. Ashdown, 509 F.2d 793, 797-98 (5th Cir. 1975).

Defendant incorrectly asserts that the statute began to run in 2004, when Brown refused to participate in the insurance fraud scheme. Def. Mem. in Supp. of Acquittal 4. The mailing alleged in Count Twelve occurred on May 17, 2005. Indictment 16. The evidence supported this date as constituting the offense. N.T. 50. The government filed the Indictment on February 18, 2010, well within the five-year statutory period. Id. at 1. As such, the statute of limitations argument is without merit.

   B.   **Culpable Participation**

To support a conviction for mail fraud, the government's evidence must exhibit that the defendant agreed to participate in a scheme to defraud and that he caused the mails to be used in furtherance of the scheme. Periera v. United States, 347 U.S. 1, 8-9 (1954). The Third Circuit has further defined three substantive elements of 18 U.S.C. § 1341, requiring "1) the existence of a scheme to defraud; 2) the use of the mails in furtherance of the fraudulent scheme; and 3)

culpable participation by the defendant."³  Pearlstein, 576 F.2d at 534; accord Dobson, 419 F.3d at 237; United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994).

With respect to culpable participation, the government must demonstrate by more than a reasonable doubt that a defendant participated in a fraudulent scheme; the government must establish that the defendant had "knowledge of the illicit objectives of the fraudulent scheme and willfully intend[ed] that those larger objectives be achieved." Dobson, 419 F.3d at 239 n.8 (quoting Genty v. Resolution Trust Corp., 937 F.2d 899, 908-09 (3d Cir. 1991)). In that case, Dobson worked as a salesperson for Universal Liquidators ("UL"), which fraudulently purported to locate and resell surplus and liquidated merchandise. Id. at 234. In her role as salesperson, Dobson misled customers about her role within UL and the success of UL brokers. Id. at 235. However, Dobson testified that, while she made misleading sales pitches, she remained unaware of UL's overall fraudulent nature. Id. at 234-35. Citing Pearlstein, the Third Circuit held the undersigned's jury instructions did not clearly advise the jury of the government's burden to prove Dobson's culpable participation or specific intent in the overall scheme to defraud, thereby reversing Dobson's conviction and remanding for a new trial. Id. at 237-40. The government subsequently elected not to retry Dobson.

The Court rejects Defendant's argument that Defendant's and Brown's testimonies are not in conflict with one another. Def. Mem. in Supp. of Acquittal 3. Brown and Defendant offered conflicting testimony regarding: (1) the subject of Brown's and Defendant's

---

³ The parties's stipulation regarding Officer Reid's fictitious Form 75-48 demonstrates that a scheme to defraud existed. Trial Tr. 16-17. The parties also stipulated that the fraudulent scheme was furthered by Safe Auto Insurance Company mailing of a $7,000 check to Morris on or about May 17, 2005. Trial Tr. 20. Thus, the only substantive question of law is whether the government has proven beyond a reasonable doubt that Defendant culpably participated in the mail fraud scheme with the specific intent to defraud.

conversations, (2) whether Defendant asked for and obtained Brown's insurance card, (3) with whom Defendant arranged Brown to meet, (4) that Defendant had knowledge he was participating in a "scam," and (5) whether Defendant stayed and had knowledge of Brown's subsequent meeting with Morris. See generally Trial Tr., 22-28.

At trial, the Court found Brown's testimony about Defendant's participation in the mail fraud credible, and thus, this Court accepts Brown's testimony concerning the events that transpired with Defendant. Trial Tr., 79. None of the government's exhibits demonstrated Defendant's specific knowledge or intent to aid or abet the furtherance of the mail fraud that occurred on or about May 17, 2005. The government elected not to call Morris, Blassengale or other participants in the mail fraud scheme to testify, who may have offered insight into Defendant's participation in the operation. Trial Tr. 75. Therefore, this Court must determine whether the stipulated facts and Brown's testimony prove beyond a reasonable doubt that Defendant aided and abetted the 2005 mail fraud.

The government argues this matter is a straightforward case of aiding and abetting mail fraud and less complex than those presented in Pearlstein and Dobson. Mem. of Law 6-7. In Pearlstein, defendant salesmen provided misleading statements to customers in an effort to boost sales. Pearlstein, 576 F.2d at 538. However, such misleading sales pitches were distinct from the fraudulent scheme alleged by the government, which related to the illicit objectives of their employer's scheme to defraud customers. Id. at 541-42. In reversing Pearlstein's guilty verdict, the Third Circuit reasoned that when "two layers of fraud are at issue," the relevant inquiry is not whether the defendant made fraudulent statements but whether "the fraudulent statements he did make were in furtherance of the overarching fraudulent scheme" at issue in trial. United States v.

Blood, 232 F. App'x 199, 203, 2007 WL 2310025 (3d Cir. 2007) (citing Pearlstein, 576 F.2d at 537); see also Dobson, 419 F.3d at 237 (requiring that jury must be instructed and find whether or not the defendant culpably participated in the "illicit enterprise" charged in the indictment).

      The facts of this case are more similar to Blood, which the Third Circuit distinguished from both Pearlstein and Dobson.  Blood, 232 F. App'x at 203.  In Blood, Blood argued that his own statements were distinguishable from those of his investment company and constituted two layers of fraud.  Id.  However, the Third Circuit held that Blood's personal misrepresentations were "[u]nlike Dobson's statements" and "in furtherance of the one and only scheme to defraud."  Id.  Blood also argued that given the conflict between his alternate version of the facts and the evidence proffered by the government, insufficient evidence existed to convict him beyond a reasonable doubt of mail fraud.  Id. at 203-04.  In affirming Blood's conviction, the Third Circuit rejected Blood's arguments and held that a trier of fact could reasonably find that the weight of the government's evidence demonstrated Blood's guilt beyond a reasonable doubt.  Id. at 203-05.

      In this case, Brown's testimony consistently demonstrated that Defendant's actions and statements indicated "knowledge of the illicit objectives of the fraudulent scheme and [a willful intention] that those larger objectives be achieved."  Dobson, 419 F.3d at 239 n.8 (quoting Genty, 937 F.2d at 908-09).  Brown's testimony established that Defendant: (1) purposefully approached Brown, (2) asked Brown if he had automobile insurance, (3) took Brown's Safe Auto insurance card, (4) told Brown that he would be compensated for his participation, and (5) took Brown to Morris's home where he introduced Brown to Morris – all in furtherance of Morris's plan to defraud Safe Auto.  Trial Tr., 23-24, 28-30.  That Brown talked to Defendant "about an insurance scam" and Defendant took Brown's Safe Auto insurance card, supports a finding that Defendant

specifically intended to aid or abet fraud and culpably participated in furthering the illicit enterprise by recruiting Brown. Id. at 24. Moreover, that Defendant introduced Brown to Morris as the person with whom he "was supposed to be hooked up with to do this insurance thing" and "It was a scam" reinforces Defendant's specific intent to aid and abet Morris's mail fraud scheme. Id. at 30. Brown's testimony establishes, as in Blood, that Defendant culpably participated in a single-layer scheme to commit mail fraud. Blood, 232 F. App'x at 203.

The Court remains unconvinced by Defendant's alternate recollection of facts, and finds that the weight of the evidence provided by the government's witness, Brown, proves beyond a reasonable doubt that Defendant aided or abetted the alleged mail fraud that occurred on or about May 17, 2005. See Blood, 232 F. App'x at 203-05. Accordingly, the government has met its burden for the elements of 18 U.S.C. § 1341 and § 2.

**VI.   Conclusion**

For the foregoing reasons, Defendant was found guilty of aiding and abetting mail fraud.

BY THE COURT:

s/Michael M. Baylson
_____
Michael M. Baylson, U.S.D.J.

O:\Criminal Cases\10-95-14, Rippy\Rippy 10-CR-95-14 Memo 7-26-11.wpd